```
 1               IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF TEXAS

 3                      GALVESTON DIVISION

 4  Dawn M. Jackson, Individually
    and on Behalf of all Similarly
 5  Situated Persons,

 6       Plaintiffs,              Civil Action No. G-10-CV-338

 7  vs.
                                  April 21, 2011
 8                                Galveston, Texas
    Jacobs Field Services North   11:00 a.m.
 9  America, Inc.,

10       Defendants.

11

12                       MOTION HEARING

13         BEFORE THE HONORABLE JOHN R. FROESCHNER

14              UNITED STATES MAGISTRATE JUDGE

15  APPEARANCES:

16  For the Plaintiffs            Josef Franz Buenker
                                  Attorney at Law
17                                1201 Prince Street
                                  Houston, Texas 77008
18
    For the Defendant            Timothy Mitchell Watson
19                                Steve Shardonofsky
                                  Seyfarth Shaw, LLP
20                                700 Louisiana
                                  Suite 3700
21                                Houston, Texas 77002

22  Case Manager                  Sheila Anderson

23

24

25  Proceedings from official electronic sound recording;
    transcript produced by court approved transcriber.
```

DIGITAL SCROLL TRANSCRIPTION                    281.996.7978

```
 1   Electronic Recording Operator      Lorraine Trevino
                                        U. S. Clerk's Office
 2                                      411 U. S. Post Office
                                            Building
 3                                      601 Rosenberg
                                        Galveston, Texas 77550
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:   Don't get up.   Thanks.   Keep you seats,

2     or you can sit down.

3               Okay.   All right.   Just for purposes of the

4     record, this is a Galveston case, 2010-338, Dawn Jackson

5     versus Jacobs Field Services.

6               Could I get appearances for the record?   Who's

7     here, please?

8          MR. BUENKER:   Yes, Your Honor.   Joe Buenker,

9     appearing on behalf of the Plaintiffs.

10          THE COURT:   Great.   Thanks.

11          MR. WATSON:   Tim Watson for Jacobs, and Steve

12     Shardonofsky.

13          THE COURT:   Great.   Please, sit down.

14               All right.   I mean, I understand the dispute,

15     and I've read through the pleadings or the motion.   But there

16     wasn't a reply, but I assume, since you're here, you're still

17     wanting to certify the class.

18          MR. BUENKER:   I had miscalendared it, Your Honor, and

19     by the time I realized it I was past the deadline, so –

20          THE COURT:   Okay.

21          MR. BUENKER:   -- I didn't –

22          THE COURT:   Okay.

23          MR. BUENKER:   But, yes, I am still – and I disagree

24     with the assertions by Jacobs.

25          THE COURT:   Okay.   Which assertions do you disagree

1  with –

2         MR. BUENKER:  Well –

3         THE COURT:  -- in regard to the fact that these might

4  all become mini trials because not everybody had to attend

5  every day and those kinds of things?

6         MR. BUENKER:  I think the issue is going to be

7  whether the various shifts has to attend – had to attend

8  safety meetings.  And my folks only –

9         THE COURT: Okay.

10        MR. BUENKER:  -- worked on the first shift.

11        THE COURT:  Okay.

12        MR. BUENKER:  And I think that if a notice goes out

13  that – to folks – and I think it has to go out to everyone who

14  worked in the Scaffolding Department, but if notice goes out

15  that specifies – and you were required to attend safety

16  meetings at the beginning of your shift, I think that culls

17  out all those folks who say I never had to go to a safety

18  meeting.

19        THE COURT:  Okay.

20        MR. BUENKER:  And I don't – I mean, unless Jacobs can

21  say these are the people we required to come prior to their

22  shift to attend a safety meeting, I don't think there's any

23  other way to cull out the folks that have the same assertion –

24  and that's really the –

25             I know that the response addressed both the

1  walking time and the – and I'm not concerned about the walking

2  time –

3           THE COURT:  Sure.

4           MR. BUENKER:  It's the safety meeting.

5           THE COURT:  Right.

6           MR. BUENKER:  And I think the only way to see if

7  there are other folks who assert that they were subject to

8  this kind of practice just to have the notice sent out.

9                My clients say that they were there, and their

10  co-workers were all there and required to be there.

11          THE COURT:  Okay.  And do your clients say that the

12  shift that they were on was pretty constant, so it was the

13  same people over and over again, or were there new people

14  showing up on that ship?  Does that make sense?

15          MR. BUENKER:  I don't know that I asked that specific

16  question.

17          THE COURT:  Okay.  Okay.

18          MR. BUENKER:  My client said there were about

19  seventy-five people in their position, who were required to

20  substitute these same circumstances.

21          THE COURT:  Oh.

22          MR. BUENKER:  And I don't know what the identities –

23  they worked fairly constant shifts.  I think they occasionally

24  had to come in early or work late here and there, but the two

25  of them worked fairly constant –

```
 1              THE COURT:  Okay.

 2              MR. BUENKER:  -- shifts.

 3              THE COURT:  I understand the problems that the

 4   Defendants are pointing out.  And I guess I'm starting from

 5   the situation first that if Jacobs didn't pay these people,

 6   and if Jacobs really owes these people, it ought to pay them

 7   and shouldn't just be able to walk away from it.  On the other

 8   hand, I realize how difficult it's going to be to identify

 9   these people or send out any kind of notice.

10              But let's just assume for our purposes right now

11   that we're thinking about doing that.  And I'm not saying

12   that's going to be my ruling, but let's just assume that.  Can

13   we do it conditionally under the statute, or basically, like,

14   reserving the right, obviously, to decertify?

15              MR. WATSON:  Oh, absolutely, Judge.  That's,

16   typically --

17              THE COURT:  Please sit down.

18              MR. WATSON:  Typically - you know, that's typically --

19              THE COURT:  Okay.

20              MR. WATSON:  -- how the case progresses, is there's

21   conditional certification.

22              THE COURT:  All right.

23              MR. WATSON:  Notice goes out, and then, you know,

24   whoever joins, joins.

25              THE COURT:  Right.
```

1          MR. WATSON:  There's additional discovery, and then,

2     typically, there is a motion for decertification, based on the

3     additional discovery.

4          THE COURT:  Okay.  And then, I guess we're all in

5     agreement – we're focusing in on these meetings –

6          MR. BUENKER:  Yes, sir.

7          THE COURT:  Because the commuting time isn't covered.

8               So, what do you know about the recordkeeping of

9     Jacobs?  Do they keep attendance records of these meetings, so

10    that they know who was there and who wasn't?  Do they – well,

11    I guess, let's start there.  I mean, if we looked at them,

12    would we find a list of everybody who was at these meetings,

13    when the meetings were held shift-wise, those kinds of things,

14    and if so, how difficult is it to produce those, because they

15    probably would be discoverable anyway –

16         MR. BUENKER:  Sure.

17         THE COURT:  -- even if we didn't certify the class,

18    insofar as the ones that these people attended.

19         MR. BUENKER:  Right.

20         THE COURT:  Which from what I understand you're

21    saying is you're focused, right?

22         MR. BUENKER:  Yes, sir.

23         THE COURT:  The people on that shift, at least, and

24    if it turned out to be more than that later that's one thing.

25         MR. BUENKER:  Right.  Right.

1          THE COURT:  But I mean – it seems like if these

2   records exist they could ask for them in discovery, and they'd

3   find out who was there and who wasn't anyway.  So – but I

4   don't know if those records exist.  Do you know?

5          MR. WATSON:  I'm going to let Mr. Shardonofsky –

6          THE COURT:  Sure.

7          MR. WATSON:  -- because we just had a conversation a

8   couple of days ago about some records.

9          THE COURT:  Yeah.

10         MR. SHARDONOFSKY:  Your Honor, my understanding, from

11  speaking with various folks at Jacobs, is that these were sort

12  of informal safety meetings that did occur every day or almost

13  every day, but that there wasn't an attendance list that was

14  taken –

15         THE COURT:  Okay.

16         MR. SHARDONOFSKY:  -- during these safety meetings.

17  My understanding is that Jacobs has various types of

18  timekeeping records for the Scaffolding Department, but those

19  records won't necessarily show who attended these meetings –

20         THE COURT:  Okay.

21         MR. SHARDONOFSKY:  -- or the time that these meetings

22  started.

23         THE COURT:  Okay.

24         MR. SHARDONOFSKY:  What Jacobs has is time sheets –

25         THE COURT:  Sure.

1          MR. SHARDONOFSKY:  -- that were prepared by the

2     individual foreman for each crew.  And those – my

3     understanding is that they're at an off-storage facility right

4     now.  It's going to take some time and expense to get at

5     those, if we need to.

6          THE COURT:  Yeah.

7          MR. SHARDONOFSKY:  So, we haven't pulled them yet,

8     but, you know, we're aware that they exist.

9          THE COURT:  Okay.

10         MR. WATSON:  And we just found out that they exist.

11         MR. SHARDONOFSKY:  We just found out that they exist

12     very recently.

13              Jacobs also has electronic documents showing the

14     times that these folks scanned in at the Jacobs compound there

15     inside the BP Texas Refinery.  And those records – it's my

16     understanding that they show, obviously, when somebody was in

17     attendance that day, but they won't necessarily show us the

18     time that they were working.  Because people would often scan

19     in and the, subsequently, eat breakfast there or read the

20     newspapers until their shifts began.

21         THE COURT:  Okay.

22         MR. SHARDONOFSKY:  And so, you know, that can get us

23     an approximation to the work time, but I don't think that's

24     going to – that's not going to tell us or answer your

25     question, Your Honor –

1          THE COURT:  Right.

2          MR. SHARDONOFSKY:  -- about when these meetings

3    started or who was present at those meetings.

4          THE COURT:  Okay.  And as I understand the

5    Plaintiff's allegations – and correct me if I'm wrong – but

6    that your allegations is there was always a meeting at the

7    beginning of the shift, that everybody was supposed to attend

8    and nobody got paid for them, basically.

9          MR. BUENKER:  That's my understanding.

10         THE COURT:  Okay.

11         MR. BUENKER:  Now, my understanding from the

12   Defendants is that there were hourly shift supervisors, or

13   some position like, that were paid for an extra hour every

14   day.

15         THE COURT:  Okay.

16         MR. BUENKER:  And those folks, clearly, if they're

17   being – if they're a shift supervisor, hourly or not, they're

18   being compensated for their time.  They're not –

19         THE COURT:  Sure.

20         MR. BUENKER:  -- a potential –

21         THE COURT:  But your theory is that most of these

22   people, of the seventy-five or so that you estimate exist,

23   were attending these meetings or supposed to attend these

24   meetings, didn't get paid for it and, actually, clocked on for

25   payment after the meetings were over – were on the clock, I

1  mean, not scanned in –

2            MR. BUENKER:  Yes.  Right.

3            THE COURT:  -- but were on the clock.

4            MR. BUENKER:  Were on the clock after the meetings.

5            THE COURT:  Yeah.

6            MR. BUENKER:  My understanding is that, based on what

7  I've heard from Mr. Shardonofsky before, is that there's this

8  scan-in procedure, but that they're not officially put on the

9  clock at the seven o'clock work in – there's not a subsequent

10 time card, time punch, anything like that, to show when they

11 actually – when Jacobs considers them working they just have a

12 de facto.  You're on the clock at seven.

13           THE COURT:  Okay.

14           MR. BUENKER:  And my folks say we were required to be

15 there a quarter 'til for these safety meetings.

16           THE COURT:  Okay.  So, the scan-in just gets them on

17 the property; doesn't it?

18           MR. BUENKER:  Into the Jacobs compound inside the BP

19 plant.

20           THE COURT:  Yeah.  And so, if he wants to get their

21 early and drink coffee and read the paper, he scans in at five

22 o'clock, whatever the deal is.  But seven o'clock is when they

23 all start.  They don't actually punch the clock; it's just

24 everybody gets paid from seven 'til wherever?

25           MR. SHARDONOFSKY:  That's true.

1          THE COURT:  Okay.

2          MR. SHARDONOFSKY:  And obviously, the leaders there,

3    the supervisors, if somebody works during their lunch shift or

4    works extra, they make an adjustment on their time sheets on a

5    daily basis.

6          THE COURT:  Sure.

7          MR. SHARDONOFSKY:  So –

8          THE COURT:  But we're not really fighting about that.

9    As I understood, the Plaintiff is just saying, I'm assuming

10   there's a fifteen minute meeting every day, that everybody's

11   supposed to be at, that nobody gets paid for.  We just can't

12   identify who would have been at those meetings from records

13   that exist with Jacobs, correct?

14         MR. SHARDONOFSKY:  My understanding is that that's

15   correct.

16         THE COURT:  Okay.

17         MR. SHARDONOFSKY:  Although we haven't seen the time

18   sheets yet.  So, maybe the time sheets may tell us something

19   that we don't know today.

20         THE COURT:  Okay.  But probably not.  They'll

21   probably just say, seven o'clock is when you were – you're

22   paid from seven to whatever.  And really, it's going to be

23   their word against yours if they show up, that they were

24   either at the meetings or not.

25         MR. SHARDONOFSKY:  I think that's correct, Your

1    Honor.

2          MR. WATSON:  Well, we would know – if I'm

3    understanding correctly, we would know who at least scanned

4    in.

5          THE COURT:  And, yeah –

6          MR. WATSON:  If someone said, I was there for the

7    meeting –

8          THE COURT:  Got you.

9          MR. WATSON:  -- and it shows that they didn't scan in

10   until after seven –

11         THE COURT:  Okay.  Sure.

12         MR. WATSON:  -- we would know that.

13         THE COURT:  Sure.  And just to follow up on that, if

14   somebody scanned in after seven, like at 7:15, will your pay

15   records still show they got paid from seven until five or

16   whatever?

17         MR. WATSON:  Well, that's a good question.

18         MR. SHARDONOFSKY:  My understanding is that that's

19   not the case.

20         THE COURT:  Okay.  Because then, they've got a

21   record the person was late.

22         MR. SHARDONOFSKY:  There's a reconciliation that's

23   done –

24         THE COURT:  Okay.

25         MR. SHARDONOFSKY:  -- between the time sheets and the

DIGITAL SCROLL TRANSCRIPTION                    281.996.7978

```
1    scan-in hours -

2              THE COURT:  Okay.

3              MR. SHARDONOFSKY:  -- where if somebody does show up

4    late, 7:15 or 7:20, then that time is taken away from them.

5              THE COURT:  Okay.  And the records that you think

6    you've identified existing somewhere have these things in

7    them?

8              MR. SHARDONOFSKY:  Well, we have -

9              THE COURT:  Or at least, you think they do.

10             MR. SHARDONOFSKY:  That's correct, Your Honor.  We

11   have possession of the scan time documents.  What we don't

12   have right now, if it's off storage, is the daily time sheets

13   for these folks.

14             THE COURT:  Okay.  So, you've got the scan-in stuff.

15   All you need is the time sheets, if we go that route, so that

16   you can figure out this person could not have possibly been at

17   the meeting, which is what you're suggesting, or it's very

18   possible they could have been, but we'll never really know.

19   We'll just have to assume that they're telling the truth when

20   they get sworn.

21             MR. BUENKER:  I think the scan in sheets are going to

22   - that they have are going to tell us, this person could not

23   possibly have been -

24             THE COURT:  That's what I'm saying.

25             MR. BUENKER:  -- there, because they scanned in at
```

1  seven o'clock or whatever, right.

2          THE COURT:  Yeah.  But most of them – yeah.  Okay.  I

3  got you.  So, we could just zero in on that.  And you agree

4  we're just dealing with the meetings how, so if we do send a

5  notice, it's just going to be –

6              And you said three years.  Is the Statute of

7  Limitations three years in a case like this?

8          MR. BUENKER:  It's presumptively two and potentially

9  three.

10          THE COURT:  Potentially three, depending on intent or

11  whatever?

12          MR. BUENKER:  Right.

13          MR. WATSON:  Exactly.

14          THE COURT:  Okay.  So then, -- okay.  So, we could, I

15  guess then, say we're go with the class certification with

16  some specific notice going out, because there'll be – there're

17  only seventy-five people, perhaps.  I assume that's in the

18  ballpark figure.  Has that been determined?

19          MR. SHARDONOFSKY:  No.  We haven't sort of pinned

20  down the number yet, Your Honor.

21          THE COURT:  Sure.

22          MR. SHARDONOFSKY:  There was, obviously, some

23  turnaround.

24          THE COURT:  Right.

25          MR. SHARDONOFSKY:  That's in the workforce.  My

1   understanding is that it's somewhere in that ballpark.

2          THE COURT:  Okay.  That's what I was just asking.

3   And you're concentrating, simply, on those people who at some

4   time or another worked the morning shift?

5          MR. BUENKER:  Who are required to attend safety

6   meetings at the beginning of their shift.  I mean, I –

7          THE COURT:  Okay.

8          MR. BUENKER:  My clients don't have personal

9   knowledge, as far as I know, of whether the evening shift or

10  any other shift has that same requirement.

11         THE COURT:  Okay.

12         MR. BUENKER:  They only know about their shift.

13         THE COURT:  Okay.

14         MR. BUENKER:  So, my proposal would be to send notice

15  to all employees who were hourly employees in this department,

16  but have the notice, specifically say, if you were required to

17  attend the safety meeting at the beginning of your shift.

18         THE COURT:  Okay.  Where do they come up with the

19  estimate of seventy-five people then?

20         MR. SHARDONOFSKY:  I don't know.  I mean, that's –

21         THE COURT:  I mean, they got –

22         MR. SHARDONOFSKY:  That's –

23         THE COURT:  It sounds to me like they got pretty

24  lucky estimating, but they were –

25         MR. SHARDONOFSKY:  They both told me that that's – I

1  mean, separately, that that's what they thought was about the

2  number of people, so –

3          THE COURT:  Okay.  They just heard that, I guess.

4  All right.

5               So, how difficult would it be to identify the

6  actual employees that fall within that period of time?

7  Probably not hard at all because you've got the time records

8  already.  Right?

9          MR. SHARDONOFSKY:  I think that's correct, Your

10 Honor.

11         THE COURT:  So –

12         MR. BUENKER:  That's correct, Judge.

13         THE COURT:  And do you know if most of these people

14 still work there, or is Jacobs still there or –

15         MR. SHARDONOFSKY:  Jacobs is still working at the BP

16 plant.  My understanding is that in the past several months

17 they've scaled back their operations.

18         THE COURT:  Okay.

19         MR. SHARDONOFSKY:  And that some folks are no longer

20 working at the BP Texas Refinery.

21         THE COURT:  Okay.

22         MR. SHARDONOFSKY:  They've been relocated to other

23 work sites in the area.

24         THE COURT:  Okay.

25         MR. SHARDONOFSKY:  I know other people have been laid

 1 │ off.

 2 │          THE COURT:  Well, sure.

 3 │          MR. SHARDONOFSKY:  So, I think we can probably

 4 │ identify those individuals, but many of them may not be

 5 │ working for Jacobs currently.

 6 │          THE COURT:  All right.  I'm just thinking – last

 7 │ known addresses, I guess, is what you need, so you can send

 8 │ them out.  And they either get it or they don't.  Or they hear

 9 │ about it, unless there's some sort of publication you put in

10 │ the newspapers or things like that, or hire somebody like

11 │ Masten does, who gets on TV and –

12 │          MR. BUENKER:  I'm not sure I'm going that route, Your

13 │ Honor.

14 │          THE COURT:  And then, I guess, we just find out how

15 │ many people respond, and if there aren't any, there aren't

16 │ any.  And if they're a whole bunch, then we have to, I guess,

17 │ decide whether we decertify it.  I assume that's what you were

18 │ talking about earlier.

19 │          MR. WATSON:  Yes.

20 │          THE COURT:  Because it really does just become a

21 │ mishmash, but we still have identified that way the people who

22 │ claim that they weren't paid and under FLSA probably should

23 │ have been paid, from what I understand about the law.  So, it

24 │ really seems only fair that they would, at least, get an

25 │ opportunity to say, hey, you owe me some money from –

1          MR. WATSON:  Yeah.

2          THE COURT:  So, pay it.  And I don't know of any

3    other way that – I mean, it seems like we're soliciting

4    business this way, but I guess lawyers do that these days now.

5    They didn't do it when I was practicing law.

6               Okay.  Well, my – I'm leaning that way, but is

7    there anything more you would like to say in support of me not

8    doing that, since especially, you've told me I've got the out

9    later on down the line, and it doesn't sound like it's a big

10   burden on Jacobs to produce the information.  We're going to

11   need to, at least, get this notice out, and then we have to

12   worry about – okay?

13         MR. WATSON:  Well, Judge, I – you know – we've sort

14   of walked through the analysis, and it's difficult to argue

15   with your reasoning.  You know, we've briefed it –

16         THE COURT:  Sure.

17         MR. WATSON – as best we can.

18         THE COURT:  It's – you know – I dealt with something

19   like this in a Wal-Mart situation, where they wanted every

20   Wal-Mart employee in the entire State of Texas – I said, whoa,

21   wait a minute.  Now, that's one thing.  But we're talking

22   about a fairly small number of people, a fairly localized

23   operation, and you're telling me you really already have in

24   possession the timesheets, or whatever they are, to identify

25   these people and probably even have the addresses and stuff

1   like that on them, and so –

2               And if not, I would think – it's not a big deal,

3   I guess is what I'm saying.  I mean, it's going to cost your

4   clients some money to do it, but if we were talking about

5   thirty thousand people, you know, I'd be more concerned about

6   it –

7           MR. WATSON:  Sure.

8           THE COURT:  -- I think.

9           MR. WATSON:  Sure.

10          THE COURT:  But it could be we'd just be talking

11  about fifteen by the time it all plays out.  So, I think what

12  I'll do is at least start the process going.  So, what notice

13  language do you think we need?

14          MR. WATSON:  Well, typically, we work out the form of

15  notice.  It's become fairly standardized.

16          THE COURT:  Is it?  Okay.

17          MR. WATSON:  I'm sure Mr. Buenker has a form; I have

18  a form.  I think – so – I mean – and unless Mr. Buenker has

19  some specific requests.  Usually, it's – I mean, here I think

20  the – what I would propose if we're going to go the notice

21  route –

22          THE COURT:  Yeah.

23          MR. WATSON:  -- is to identify the hourly employees,

24  excluding the foreman and/or supervisors who were paid at a

25  shift that began at seven o'clock – or excuse me – at six

 1  o'clock.

 2         THE COURT:  Okay.  Okay.  Yeah.  It's just a matter

 3  of tailoring it so that –

 4         MR. WATSON:  Yeah.

 5         THE COURT:  -- it certain- -- it focuses on the

 6  people we really want to get in touch with, as opposed to –

 7         MR. BUENKER:  And then, I agree.  I think we can work

 8  out –

 9         THE COURT:  Okay.

10         MR. BUENKER:  -- work out the particular language of

11  the notice.  I think it ought to be – go out in English and in

12  Spanish, if that's acceptable to the Court and to the

13  Defendant, because – I know from my experience one of my

14  clients is – I mean, speaks English but not terribly good

15  English, and I understand some of the other folks are

16  primarily Spanish speakers as well.

17         THE COURT:  Okay.  So, the first step is once I grant

18  this, with the understanding we could decertify – well, I

19  guess you can always decertify, so I don't need to worry about

20  that.  We grant this to let notice go out.  We structure the

21  notice, so that we've got a notice that's agreeable to

22  everybody, or if you need me to help do that because you can't

23  agree.  And then, we produce the time records and the

24  addresses and send them out – or I guess we could be doing

25  that anyway, since you know it's going to be produced.  And

1   then, you could ask them to start getting the other

2   information that's locked up some place.

3           And what else do we do then at this juncture?

4           MR. BUENKER:  And we'll submit the notice to the

5   Court for the Court's approval.

6           THE COURT:  Sure.

7           MR. BUENKER:  And once it gets approved, it'll be

8   sent.

9           THE COURT:  Okay.

10          MR. WATSON:  I don't know how long it will take to

11  identify the putative class, potential class members,

12  considering we just found these records the other day.

13          Do you have any view on that?

14          MR. SHARDONOFSKY:  It may take several weeks, Your

15  Honor.

16          THE COURT:  That's fine.

17          MR. SHARDONOFSKY:  You know, I guess - and I'm sort

18  of having - I'm thinking in my head how to identify these

19  individuals.  Obviously, there were different shifts at the

20  site, and if we're looking to identify a group of people who

21  worked the morning shift, you know, different people had

22  different shifts throughout their tenure with the company at

23  BP.  So, it may take a bit of time to cull out that

24  information from the time records, and I can get a list

25  together.  But, you know, I think several weeks - we might

1  need several weeks –

2       THE COURT:  Sure.

3       MR. SHARDONOFSKY:  -- to do that.

4       THE COURT:  Okay.  Was he trying to limit the class

5  from less than what you wanted?

6       MR. BUENKER:  I didn't think we were just talking

7  about the morning class.

8       THE COURT:  I didn't either.  I didn't think you were

9  any way.

10      MR. BUENKER:  Right.  I'm certainly not.

11      THE COURT:  I think you were just talking about

12  people who had to go to –

13      MR. BUENKER:  Hourly employees who worked at the –

14      THE COURT:  Had to go to meetings –

15      MR. BUENKER:  -- Scaffolding Department, who were not

16  supervisory personnel.  I would think that that would be a

17  code that Jacobs can type into their computer system and get

18  those people.

19      THE COURT:  And who didn't get paid for it.

20      MR. BUENKER:  Right.  Right.

21      THE COURT:  Yeah.  I mean, if they are right in the

22  middle of their shift and they were on a clock and they were

23  being paid, I mean, it's got to be conditioned on – plus you

24  got stiffed out of money.

25      MR. BUENKER:  Right.

1          MR. SHARDONOFSKY:  I guess it's my understanding that
2     the only safety meetings that occurred at the site were done
3     in the morning.
4          THE COURT:  That could be.
5          MR. SHARDONOFSKY:  And so –
6          THE COURT:  And if so, that'll – but it doesn't mean
7     that we can't err on the side of inclusion as opposed to
8     exclusion.
9          MR. SHARDONOFSKY:  So, just so I can get the Court's
10    clarification.
11               You're looking for a list of all the hourly
12    scaffold builders or scaffold helpers at the site; is that
13    correct, Your Honor?
14         THE COURT:  I think so.
15         MR. BUENKER:  All hourly employees.
16         THE COURT:  And then, the notice will be that we were
17    required to attend meetings and did attend meetings and were
18    not compensated for it, and, I guess, in a nutshell; isn't it?
19         MR. BUENKER:  Basically.
20         THE COURT:  Something like that.
21         MR. BUENKER:  Yes, Your Honor.
22         THE COURT:  Okay.  And then, the notice shouldn't be
23    hard to draft up, but then we just need to wait on the list of
24    the people we're going to send it to.
25         MR. WATSON:  Yeah.  And Mr. Buenker may be right.  It

1    may be something that we could go and they can punch up on a

2    computer real quick.

3            THE COURT:  Yeah.

4            MR. WATSON:  I just don't know.

5            THE COURT:  Okay.  And we're going back three years

6    from –

7            MR. WATSON:  Three years from today.

8            MR. BUENKER:  From whatever day the information gets

9    produced, Your Honor.

10           MR. WATSON:  Yeah.

11           THE COURT:  So – all right.  Then, I can sign that

12   order.  If you can get me the notice within ten days?

13           MR. BUENKER:  Yes, sir.

14           THE COURT:  I mean, does that sound realistic?

15           MR. WATSON:  Sure.

16           THE COURT:  Okay.  Today's the 21st.  So – well, why

17   don't we just say by the – well, I'm going to be gone the week

18   of May the 2nd, but if you can just get it here sometime

19   during that week of May the 2nd, I'll just set May the 6th as

20   the deadline for it, because I won't be here anyway until May

21   the – the next Monday, unless you want to get it in next week.

22   It doesn't matter to me.

23           MR. WATSON:  I think we'll take the time just in

24   case –

25           THE COURT:  Okay.


DIGITAL SCROLL TRANSCRIPTION                        281.996.7978

1        MR. WATSON:  There's a few sticking points,

2   typically, on the form of notice, so – like, you know, how

3   long a period to opt in, and –

4        THE COURT:  Okay.

5        MR. WATSON:  I can't remember all the other arguing

6   points.

7        THE COURT:  That's a deal.

8              And then, if you've got problems and when I back

9   it says, these are our proposals on each side, I'll just – if

10  it's okay with you I'll just set up a phone conference –

11       MR. WATSON:  That's fine.

12       THE COURT:  -- and we'll knock it out.

13       MR. WATSON:  That's fine.

14       THE COURT:  We won't have a record of it, but –

15       MR. WATSON:  That's fine.

16       THE COURT:  -- who cares.

17       MR. BUENKER:  Yes, sir.

18       THE COURT:  And then, I guess you can start the ball

19  rolling, knowing what we're going to be doing, as far as

20  getting that other information, if you need it, to scan in

21  stuff or – and you're thinking it'll be several weeks before

22  you can get all that and identify these people, probably?

23       MR. WATSON:  Well, again, Your Honor, just

24  identifying the people that may not take too much time.

25       THE COURT:  Okay.

1          MR. WATSON:  The records that Mr. Shardonofsky has

2     discovered are – that may be quite a task.

3          THE COURT:  Yeah.  Where are they; do you know?

4          MR. WATSON:  Off site, in storage.  I don't know

5     exactly where.

6          MR. SHARDONOFSKY:  I don't know, Your Honor, where

7     they're located right now.

8          THE COURT:  But somebody does, I guess, so –

9          MR. SHARDONOFSKY:  Yes.

10         THE COURT:  All right.  I can't imagine there're just

11    too voluminous, so –

12         MR. WATSON:  Well, I don't know if, for example, if

13    they're separated out by scaffold workers.

14         THE COURT:  I see what you're saying.

15         MR. WATSON:  I mean, they may just be some –

16         THE COURT:  Okay.

17         MR. WATSON:  And, apparently, there's not an

18    electronic copy.  They're literally – is that right?

19         MR. SHARDONOFSKY:  I think so.

20         MR. WATSON:  Literally, you know, we're talking about

21    paper.

22         THE COURT:  Okay.

23         MR. BUENKER:  And I think those records go more

24    to the merits of the individual claims, as opposed to

25    identifying the –

```
 1              THE COURT:  Yeah.
 2              MR. BUENKER:  -- the people who - for purposes of
 3    notice.  I think we're talking about -
 4              THE COURT:  Okay.
 5              MR. BUENKER:  -- whoever opts in those records may
 6    become more important.  But that's all.
 7              THE COURT:  I've got you.  So, until we know who opts
 8    in and doesn't, I mean, there's no rush to get those records.
 9              MR. SHARDONOFSKY:  It may not make sense to pull the
10    records for a hundred folks -
11              THE COURT:  Yeah.
12              MR. SHARDONOFSKY:  -- if only ten are going to opt
13    in.  We may have to just wait to see who opts in -
14              THE COURT:  Okay.
15              MR. SHARDONOFSKY:  -- and then, you know, sort of go
16    out and seek the records after --
17              THE COURT:  Sure.
18              MR. SHARDONOFSKY:  -- we know who's in or not.
19              THE COURT:  And then, how much time, traditionally,
20    do you give people to opt in, or what's realistic?
21              MR. WATSON:  You know, typically, the defense argues
22    for forty-five.  The Plaintiff argues for ninety, and they
23    compromise at sixty.  If you want to know and cut to the
24    chase.  I mean, that's, particularly, how it works.
25              MR. BUENKER:  That sounds about right.
```

1          THE COURT:  Okay.  All right.  Well, then, the notice

2    then will have — you've got sixty days in it.  All right.  So,

3    that means if we've got that in a couple of weeks and then

4    we've got two more months, then there's not much we can do

5    until we know who's in or not.

6          MR. WATSON:  Correct.

7          THE COURT:  I mean, is that right?

8          MR. WATSON:  Correct.

9          MR. BUENKER:  Yes, sir.

10          THE COURT:  So, it doesn't make any sense to set

11    deadlines or discuss discovery issues or anything like that.

12    And I guess you could find out how easy it's going to be to

13    get that other information without really telling somebody to

14    go to work on it.  If you think I can — if I could set a

15    deadline to motivate that to get done because you think that's

16    a good idea I'll do it.  And then, you can blame — you know,

17    you can say, well, the Judge just said we got to do it.  We've

18    got to get it done, and — with the understanding, between us

19    girls, I ought to let you have more time if you really can't

20    do it.

21          MR. BUENKER:  We're going to play in the boxes to see

22    how it's organized there, Your Honor.

23          MR. SHARDONOFSKY:  I think, Your Honor, in the past

24    week we sort of located these documents.

25          THE COURT:  Okay.

1          MR. SHARDONOFSKY:  And I've heard some grumblings

2  about how difficult –

3          THE COURT:  Well, sure.

4          MR. SHARDONOFSKY:  -- it is to get these records,

5  but –

6          THE COURT:  Yeah.

7          MR. SHARDONOFSKY:  -- we're going to sort of get the

8  ball rolling and see what, you know, what the volume of

9  documents it is that we're talking about.

10          THE COURT:  Okay.

11          MR. SHARDONOFSKY:  See where they're located, and,

12  you know, maybe we can have a discussion with Mr. Buenker next

13  week.

14          THE COURT:  All right.  Then, is everybody

15  comfortable if I don't set a deadline about that?

16          MR. BUENKER:  Yes, sir.

17          THE COURT:  We just deal with it after the notice

18  period comes.

19          MR. BUENKER:  Yes, sir.

20          THE COURT:  Okay.

21              All right.  Then, what else can we do today?

22  We've got the notice.

23          MR. BUENKER:  Nothing, Your Honor.

24          THE COURT:  Okay.

25          MR. WATSON:  I think that's it.


DIGITAL SCROLL TRANSCRIPTION                          281.996.7978

1          THE COURT:  The notice will get here by May the 6th.

2    Hopefully, it'll be agreeable.  It doesn't seem like it can't

3    be something you can cobble together.  The sixty days will –

4    that's fine with me.  And then, we're just see whenever it

5    goes out and what happens.

6               So, I guess once we know when it goes out then I

7    can just sort of set a scheduling conference or a status

8    conference, maybe seventy-five days out from there.

9          MR. BUENKER:  Yes, sir.

10         MR. WATSON:  Yeah.

11         THE COURT:  Then, we'll just see what happens.

12         MR. WATSON:  That sounds good.

13         THE COURT:  Okay.

14         MR. BUENKER:  It'll work.

15         THE COURT:  Okay.  So, really, all I'm doing today

16   then is granting the motion for certification of the class?

17         MR. BUENKER:  Thank you.

18         THE COURT:  Anything else, then, we can do while

19   you're here?

20         MR. BUENKER:  I don't believe so.

21         THE COURT:  No?

22         MR. WATSON:  Go to the beach.

23         THE COURT:  Well, spend some money in Galveston.

24   We need it.

25         MR. BUENKER:  Eat some seafood.

1            THE COURT:  Okay.  Well, thanks for coming down.

2            MR. BUENKER:  All right.  Thank you, Your Honor.

3            MR. WATSON:  Thank you, Your Honor.

4            MR. SHARDONOFSKY:  Thank you, Judge.

5            THE COURT:  And if something comes up, just let me

6    know.

7            MR. BUENKER:  Thank you, Honor.  Have a good Easter.

8            THE COURT:  Okay.  Sure.

9        (Proceedings concluded at 11:26 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

33

```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE SOUTHERN DISTRICT OF TEXAS

 3                       GALVESTON DIVISION

 4

 5       I, Kareem Frederick, court approved transcriber, certify

 6   that the foregoing is a correct transcript from the official

 7   electronic sound recording of the proceedings in the above-

 8   entitled matter.

 9

10   /s/ Kareem Frederick    _____           July 15, 2011
     Kareem Frederick                        Date
11   Digital Scroll Transcription

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```